1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TENNESSEE
2                    WESTERN DIVISION

3   ————————————————————————————————————————————
    SCOTT TURNAGE, DEONTAE TATE, JEREMY S.      |
    MELTON, ISSACCA POWELL, KEITH BURGESS,      |
4   TRAVIS BOYD, TERRENCE DRAIN, and            |
    KIMBERLY ALLEN on behalf of themselves      |  NO. 2:16-CV-2907
5   and all similarly situated persons,         |
                          Plaintiffs,           |
6   vs.                                         |
    BILL OLDHAM, in his individual capacity     |
7   as former Sheriff of Shelby County,         |
    Tennessee; FLOYD BONNER, JR., in his        |
8   official capacity of Sheriff of Shelby      |
    County, Tennessee; ROBERT MOORE, in his     |
9   individual capacity as former Jail          |
    Director of Shelby County, Tennessee;       |
10  KIRK FIELDS, in his official capacity as    |
    Jail Director of Shelby County,             |
11  Tennessee; CHARLENE McGHEE, in her          |
    individual capacity as former Assistant     |
12  Chief of Jail Security of Shelby County,    |
    Tennessee; REGINALD HUBBARD, in his         |
13  official capacity as Assistant Chief of     |
    Jail Security of Shelby County,             |
14  Tennessee; DEBRA HAMMONS, in her            |
    individual capacity as former Assistant     |
15  Chief of Jail Programs of Shelby County,    |
    Tennessee; TIFFANY WARD, in her official    |
16  capacity as Assistant Chief of Jail         |
    Programs of Shelby County, Tennessee;       |
17  SHELBY COUNTY TENNESSEE, a Tennessee        |
    Municipality; TYLER TECHNOLOGIES, INC.,     |
18  a foreign corporation; GLOBAL TEL*LINK      |
    CORPORATION, a foreign corporation;         |
19  SOFTWARE AG USA, INC., a foreign            |
    corporation; and SIERRA-CEDAR, Inc., a      |
20  foreign corporation, SIERRA SYSTEMS         |
    GROUP, INC., a foreign corporation; and     |
21  TETRUS CORP, a foreign corporation,         |
                          Defendants.           |
22  ————————————————————————————————————————————

23                  TRANSCRIPT OF HEARING
                        BEFORE THE
24               HONORABLE SAMUEL H. MAYS
                   FRIDAY, JULY 9, 2021
25
          TINA DuBOSE GIBSON, RPR, OFFICIAL REPORTER

                  **UNREDACTED TRANSCRIPT**

2

```
 1               A P P E A R A N C E S

 2

 3        Appearing on behalf of the Plaintiffs:

 4            FRANK L. WATSON, III
             WILLIAM F. BURNS
 5            WILLIAM E. ROUTT, III
             Watson Burns, PLLC
 6            253 Adams Avenue
             Memphis, Tennessee 38103
 7            (901) 529-7996
             fwatson@watsonburns.com
 8            bburns@watsonburns.com
             wroutt@watsonburns.com
 9
             WILLIAM E. COCHRAN, JR.
10            HOLLY RENKEN
             Black McLaren Jones Ryland & Griffee, P.C.
11            530 Oak Court Drive
             Suite 360
12            Memphis, Tennessee 38117
             (901) 762-0535
13            wcochran@blackmclaw.com
             hrenken@blackmclaw.com
14
        Appearing on behalf of the Defendant Shelby County
15        and the individually named defendants in their
        individual and official capacities:
16
             ODELL HORTON, JR.
17            ROBERT E. CRADDOCK, JR.
             MEGHAN McMAHON COX
18            Wyatt Tarrant & Combs, LLP
             1715 Aaron Brenner Drive
19            Suite 800
             Memphis, Tennessee 38120
20            (901) 537-1082
             ohorton@wyattfirm.com
21            rcraddock@wyattfirm.com
             mcox@wyattfirm.com
22
             EMMETT LEE WHITWELL
23            Shelby County Attorney's Office
             160 North Main Street
24            Suite 950
             Memphis, Tennessee 38103
25            (901) 222-2100
             lee.whitwell@shelbycountytn.gov
```

**UNREDACTED TRANSCRIPT**

```
 1        Appearing on behalf of the Defendant Global
          Tel*Link Corporation:
 2
                  RUSSELL BRANDON BUNDREN
 3                Bradley Arant Boult Cummings, LLP
                  1600 Division Street
 4                Suite 700
                  Nashville, Tennessee  37203
 5                (615) 252-6647
                  bbundren@bradley.com
 6

 7        Appearing on behalf of the Defendant
          Sierra-Cedar, Inc.:
 8
                  ALBERT G. McLEAN
 9                Spicer Rudstrom, PLLC
                  119 South Main Street
10                Suite 700
                  Memphis, Tennessee 38103
11                (901) 522-2324
                  amclean@spicerfirm.com
12

13        Appearing on behalf of the Defendant Software AG
          USA, Inc.:
14
                  DOUGLAS F. HALIJAN
15                Burch, Porter & Johnson, PLLC
                  130 North Court Avenue
16                Memphis, Tennessee 38103
                  (901) 524-5123
17                dhalijan@bpjlaw.com

18
          Appearing on behalf of the Defendant Sierra
19        Systems Group, Inc.:

20                HEATHER MARIE GWINN PABON
                  Gordon & Rees Scully & Mansukhani, LLP
21                3401 Mallory Lane
                  Suite 120
22                Franklin, Tennessee 37067
                  (615) 722-9010
23                hgwinn@grsm.com

24

25
```

**UNREDACTED TRANSCRIPT**

4

```
1        Appearing on behalf of the Defendant Tetrus
         Corporation:
2
                 ROBERT A. McLEAN
3                Farris Bobango Branan, PLC
                 999 South Shady Grove Road
4                Suite 500
                 Memphis, Tennessee 38120
5                (901) 259-7100
                 ramclean@farris-law.com
6

7        Appearing on behalf of the Defendant Tyler
         Technologies, Inc.
8
                 BRADLEY E. TRAMMELL
9                Baker Donelson Bearman Caldwell & Berkowitz
                 165 Madison Avenue
10               Suite 2000
                 Memphis, Tennessee 38103
11               (901) 526-2000
                 btrammell@bakerdonelson.com
12
                 BETH BIVANS PETRONIO
13               K&L Gates, LLP
                 1717 Main Street
14               Suite 2800
                 Dallas, Texas 75201
15               (214) 939-5815
                 beth.petronio@klgates.com
16

17

18

19

20

21

22

23

24

25
```

**UNREDACTED TRANSCRIPT**

```
 1                         FRIDAY

 2                      JULY 9, 2021

 3              ----------------------

 4

 5            THE COURT:  Good afternoon to everyone.  I

 6   actually recognize some of you despite your best efforts.

 7   This is the case of Powell against Oldham.  The parties have

 8   filed a motion for preliminary class approval.  I'm not going

 9   to do anything today.  So -- I don't think anybody expects me

10   to do anything today, but I am going to ask questions.  So

11   what I really want to know is, one, be as certain as I can be

12   that I understand; and, two, try to figure out areas where I

13   have concern, where the parties can address my concern today

14   or later.  So that's what I'm about.

15            Let's see who represents whom.  I think I've

16   penetrated Mr. Watson's disguise.

17            MR. WATSON:  Yes, sir.

18            THE COURT:  So I'm assuming, Mr. Watson, that you

19   are here on behalf of the plaintiffs.

20            MR. WATSON:  Yes, sir.

21            THE COURT:  Mr. Mendez, do we have all these

22   folks down?

23            CASE MANAGER:  Yes, sir.

24            THE COURT:  All right.  Who else is representing

25   the plaintiffs this afternoon?
```

**UNREDACTED TRANSCRIPT**

1              MR. BURNS:  Good afternoon, Your Honor.  Bill

2    Burns on behalf of the class.

3              THE COURT:  Mr. Burns.

4              MR. BURNS:  If the Court will recall, you

5    appointed Mr. Watson and myself and Mr. McLaren as class

6    counsel in the case.

7              THE COURT:  Yes.  And Mr. McLaren and, I believe,

8    Mr. Timmons, two --

9              MR. BURNS:  Both are out of town.

10             THE COURT:  -- two counsel told me they were out

11   of town, and I've long since forgiven them.  They did not

12   express a desire to continue the hearing, so I didn't.  And I

13   suppose the two of you are adequate.  And, otherwise,

14   Mr. Timmons and Mr. McLaren will be estopped, although their

15   clients won't be.

16             And someone else has leapt to his feet.

17             MR. COCHRAN:  Your Honor, Will Cochran.  I'm also

18   here for the plaintiffs.

19             THE COURT:  All right.  Who is going to be doing

20   the talking?  Do I need to guess at this, or will it be

21   Mr. Watson?

22             MR. WATSON:  Yes, sir, Frank Watson.

23             THE COURT:  All right.  So, Mr. Watson, you'll be

24   speaking to the settlement generally and on behalf of the

25   plaintiffs; is that a fair statement?

**UNREDACTED TRANSCRIPT**

1          MR. WATSON:  Yes, sir.

2          THE COURT:  Now, I'm going to suggest that --

3   this is relatively informal from my perspective.  We can

4   probably do it in chambers except there are too many people,

5   and we couldn't distance, although some are not distancing.

6   It's a hearing of a sort, but it's not what I would call a

7   preliminary hearing.  With luck, I'll never have a

8   preliminary hearing in this case, and we'll be able to

9   proceed with an order, but I don't want to enter an order

10  that says I don't approve it.  And I've done it.  I did it

11  recently in a case, unfortunately, but I'd rather try to work

12  my way through it.

13          So the short is, sit down, talk into the

14  microphone so I can hear you.  If you need to move around to

15  talk into the microphone, there must be a place where there's

16  a microphone up on the podium.

17          Is that right, Mr. Mendez?

18          CASE MANAGER:  Yes, Your Honor, the microphone on

19  the podium is active.

20          THE COURT:  You can wander to the podium and

21  speak into the microphone, if necessary.

22          MR. WATSON:  Okay.

23          THE COURT:  Now, I've got the plaintiffs figured

24  out.  Let's see if I can figure everybody else out.

25          (Technical interference.)

**UNREDACTED TRANSCRIPT**

1              MR. WATSON:  Was that too loud?

2              THE COURT:  Oh, my.  That was very impressive,

3     Mr. Watson.  I'm not sure it can be duplicated.

4              All right.  I have Mr. Watson and Mr. Burns for

5     the plaintiffs and so forth.  What about Shelby County?  Who

6     represents Shelby County?  Mr. Horton?

7              MR. HORTON:  Yes, sir.  Odell Horton, Jr.; Lee

8     Whitwell, assistant county attorney; Mr. Craddock and Ms. Cox

9     for Shelby County and the individually named defendants in

10    their individual and official capacities.

11             THE COURT:  So you represent the county and all

12    county employees?

13             MR. HORTON:  Yes, sir.

14             THE COURT:  And are you the spokesperson,

15    Mr. Horton?

16             MR. HORTON:  Yes, sir.

17             THE COURT:  Oh, my.  Nobody said you couldn't

18    step up to the plate.

19             Now, how about next would be Tyler, the entity

20    Tyler.

21             MR. TRAMMELL:  Good afternoon, Your Honor.  Brad

22    Trammell on behalf of Tyler Technologies.  And I have Beth

23    Petronio from Dallas here also on behalf of Tyler

24    Technologies.

25             THE COURT:  All right.  So are you doing the

**UNREDACTED TRANSCRIPT**

1   talking, Mr. Trammell?

2         MR. TRAMMELL:  Only if Your Honor has questions.

3         THE COURT:  Oh, I have --

4         MR. TRAMMELL:  I might --

5         THE COURT:  Oh, trust me, I have questions.

6         MR. TRAMMELL:  All right.  There may be some --

7         THE COURT:  I may not have questions specifically

8   directed to Tyler.

9         MR. TRAMMELL:  Correct.  To give you a little

10  background, there are certain issues that the defendants may

11  have -- that have divided among themselves that I may

12  address, or Ms. Petronio may address, or Mr. Horton may

13  address.  And so if Your Honor will indulge us, we're

14  prepared on certain issues, but we can generally answer

15  hopefully all of your questions.

16        THE COURT:  Well, I would ask you, when you stand

17  up, identify yourself, if you're going to speak, so the court

18  reporter gets your name.

19        MR. TRAMMELL:  Excellent.  Brad Trammell.  Thank

20  you.

21        THE COURT:  We remember you, Mr. Trammell.

22        Now, what about GTL?  Who represents GTL?

23        MR. BUNDREN:  Yes, Your Honor.  Good afternoon.

24  My name is Brandon Bundren with Bradley, Arant, Boult and

25  Cummings in Nashville, and we represent Global Tel*Link.

**UNREDACTED TRANSCRIPT**

1          THE COURT:  Do you want to spell your last name

2     for the record?

3          MR. BUNDREN:  B-U-N-D-R-E-N.

4          THE COURT:  I got it right.  Let's hope -- I know

5     the court reporter got it right.  She gets everything right.

6          MR. BUNDREN:  Yes, Your Honor.

7          THE COURT:  To my great dismay on occasion.

8          Software AG?

9          MR. HALIJAN:  Doug Halijan, Your Honor.

10         THE COURT:  Mr. Halijan.

11         Sierra-Cedar?

12         MR. McLEAN:  Albert McLean, Your Honor, for

13    Sierra-Cedar.

14         THE COURT:  Mr. McLean, do you also represent

15    something called Sierra Systems?

16         MS. PABON:  That would be me, Your Honor, Heather

17    Gwinn Pabon on behalf of Sierra Systems.

18         THE COURT:  All right.  Do you want to spell your

19    last name too?

20         MS. PABON:  G-W-I-N-N, P-A-B-O-N.

21         THE COURT:  That went right past me, but I'll

22    remember you.

23         Did you get that?  Do you want to run it back

24    past me?

25         THE REPORTER:  G-W-I-N-N, P-A-B-O-N.

**UNREDACTED TRANSCRIPT**

```
 1            THE COURT:  D-W-I-N, T-A --

 2            THE REPORTER:  G-W --

 3            THE COURT:  E --

 4            THE REPORTER:  G-W-I-N-N, P, as in Paul, A --

 5            THE COURT:  -- B-O-N.

 6            THE REPORTER:  -- B-O-N.

 7            THE COURT:  All right.  I got that one.  Thank

 8  you.

 9            If you can't hear me, incidentally, wave your

10  hand.  Or if you can hear my voice but can't understand what

11  I'm saying -- these masks are not the most wonderful things

12  in the world.

13            All right.  Sierra Systems.

14            Tetrus?

15            MR. McLEAN:  Bob McLean, Your Honor, with Farris

16  Bobango representing Tetrus.

17            THE REPORTER:  I'm sorry.  I can't hear you.

18            Bob McLean?

19            MR. McLEAN:  Bob McLean representing Tetrus, law

20  firm Farris Bobango.

21            THE COURT:  We have a fair number of McLeans.

22            So I'm going to move through in no particular

23  order.  And I'm going to try to focus on particular areas,

24  but as usual in a case like this, they overlap.  I can tell

25  you in general what I'm not concerned about at least
```

**UNREDACTED TRANSCRIPT**

1    initially.

2              I'm not concerned about whether this is a proper

3    vehicle for a class action.  In other words, I'm not probably

4    going to be -- well, I'm certainly not going to be concerned

5    about numerosity.  I'm not going to be concerned particularly

6    probably about commonality or typicality.  Those -- that's

7    not what's on the front of my mind right now.

8              I'm not going to be concerned about the adequacy

9    of class counsel unless something arises that I don't know

10   about or has arisen that I don't know about.  I've looked

11   into the matter extensively some time back and decided on

12   class counsel, and I've had no reason to revisit that.  So

13   that's not where I will be.

14             The first thing I want to talk about is the

15   amount of the settlement so that I can be sure I understand

16   it.  My understanding is that the amount of the settlement

17   is -- let's see, $4,900,000 and that's a gross settlement

18   amount.  That's the amount the defendants are prepared on a

19   basis they've allocated to pay into an escrow account to

20   settle the case.

21             The proposed fee for class counsel is $2,400,000.

22   So then there would be fees for the claims administrator.  I

23   think the mediator is not coming out of that, but anyway,

24   there are various fees that would significantly reduce the

25   settlement amount, principally, the proposed attorney fee.

**UNREDACTED TRANSCRIPT**

1          Is that where we are essentially, Mr. Watson?

2          MR. WATSON:  Yes, sir.  The proposed legal fee,

3     which we will have to file a motion separate from this

4     motion --

5          THE COURT:  Right.  Well, I'm -- yes.  And I'll

6     evaluate the fee in more detail when I get there.

7          MR. WATSON:  Right.

8          THE COURT:  But going into a preliminary

9     approval, I like to know where I'm going.

10          MR. WATSON:  Right.

11          THE COURT:  And I understand, or I think I

12     understand, that the settlement is not contingent upon the

13     amount of any fee I might award to plaintiffs' counsel.

14          MR. WATSON:  That's correct.

15          THE COURT:  So if that be true, I don't have to

16     worry about it in the context of the settlement, but I don't

17     think it's fair for me to proceed down the road without

18     everybody knowing what, in general, I think about it.

19          MR. WATSON:  Yes, sir.  Well, the -- just so Your

20     Honor is clear that the 2.4, which will be supported by

21     lodestar under 28 USC 1988 --

22          THE COURT:  I don't want to wander into the fee

23     just yet, but we will.

24          MR. WATSON:  Okay.  Well --

25          THE COURT:  We will wander --

**UNREDACTED TRANSCRIPT**

1          MR. WATSON:  That includes expenses as well,

2    which are roughly close to $200,000.  That includes all of

3    that.

4          Now, if the Court reduces the fee by -- or

5    expenses to any matter, that money goes back into the pot.

6    That goes --

7          THE COURT:  Back into the pot.  But if there's no

8    claim or aren't sufficient claims against the pot, the pot

9    goes back to the defendants.

10          MR. WATSON:  That's correct.  Now, we're pretty

11    confident that's never going to happen.  But, yeah.

12          THE COURT:  How confident are we about that and

13    why?

14          MR. WATSON:  Because under our research -- and I

15    will tell Your Honor that recently I've -- we've gotten

16    flooded with phone calls.  Apparently, this hearing itself

17    has been publicized to the press, not by us.  There are

18    roughly 72,000 folks that walked through 201 Poplar during

19    the class period.  Now, obviously, not all of them were

20    over-detained, but our research shows that roughly 3,500

21    people, we believe, qualify for a claim.

22          And as a result, that's why we have in our

23    provision of the settlement agreement -- or the proposed

24    settlement agreement is what we call a "blow provision."  We

25    were worried that people might not get enough money.  So we

**UNREDACTED TRANSCRIPT**

1   have a provision that, if it outstrips the balance of the

2   funds available by a million dollars, our clients can come

3   back and say we don't want to do this deal because everybody

4   is not getting compensated the way we think they ought to be

5   compensated.

6          But at the end of the day, the county produced to

7   us a large voluminous spreadsheet.  We've gotten about

8   700,000 documents that were produced.  And we have gone

9   through that.  Ms. Rankin has gone through it.  I've gone

10  through it.  We've had other computer experts go through it

11  that will reflect who was over-detained.  And as a result, we

12  firmly believe that 3,500 roughly will have some claim.

13         As Your Honor knows from the settlement, what's

14  nice about it is we're paying 750 for one day, and that one

15  day starts when you've been over-detained by 9 hours.  So,

16  for example, if you were ordered by the Court to get released

17  at 2:55 p.m., and you were released at midnight, that's nine

18  hours.  That's -- that's one day.  If you were released at

19  midnight, at 12:01, that's two days.

20         But at the end of the day, all I can tell Your

21  Honor is that our research, from the production of documents

22  in the voluminous spreadsheet that was prepared by the

23  county, we think 3,500 is where we are.

24         THE COURT:  What about the 3 million?  Is that --

25  what happens if you're over two million four?  Where did the

**UNREDACTED TRANSCRIPT**

1   three million come from?

2          MR. WATSON:  Well, it doesn't come from anywhere.

3   The plaintiffs have the option but not the obligation to come

4   back and say, well, we're not going to do the settlement.

5   And as a result, we're back to square one.

6          THE COURT:  And that's if you go over three

7   million?

8          MR. WATSON:  That's correct.  Well, I believe

9   it's more than that.  Let me take a look.  Is it three?

10  Okay.  I'm sorry, yes.

11         THE COURT:  What is -- I saw a range of potential

12  recovery from $750 to $75,000.  Is there a -- is that an

13  accurate range?

14         MR. WATSON:  That -- well, that's true.  The

15  first three days of over-incarceration -- excuse me, the

16  first three days, you get $750 per day.  On the fourth day,

17  you get a $1,000 a day until day 12, in which you get $2,500

18  per day.

19         What we have said, though, is that if you're

20  going to be a claimant in the class -- which of course you

21  can opt out if you don't like our settlement.  If you're

22  going to be a claimant, we're going to cap you at $75,000

23  under that -- under that payment regime.

24         THE COURT:  Now, is there an average -- have you

25  ever calculated what an average recovery might be?

**UNREDACTED TRANSCRIPT**

17

1          MR. WATSON:  We think an average would be about

2   750 a day to maybe 1,500.  Our class representatives, which

3   we've picked because they -- they had some egregious

4   circumstances, I would say, on average are about $10,000.  We

5   have one that's going to get about $50,000.  But on average,

6   looking at it, most of these people should have been -- have

7   been detained about a day.

8          THE COURT:  So the average recovery is, you say,

9   750 to 1,500?

10          MR. WATSON:  Yes, sir.  And here's what happened.

11   While we have a -- you know, defense lawyers -- and I used to

12   be a defense lawyer -- they want a broad release.  We get it.

13   The evidence showed in the case that the problem started from

14   the go-live of the computer system.  That's the offender

15   software management system, which was not communicating with

16   the jail -- or the criminal court system, which is run by

17   Odyssey.

18          The problems were really three things:  One,

19   people would have a preset bond, but the computer would say

20   you're not entitled to a bond.  The computer would not

21   reflect when cases were dismissed for time served.  And it

22   would also not reflect when a warrant had properly been

23   served and satisfied, and people were getting rearrested.

24          What the county did do is they scrambled, and

25   they basically fixed the problem within about six to eight

**UNREDACTED TRANSCRIPT**

1   months.  We just don't see people getting over-detained after

2   that on a regular basis.

3           How did they cure that?  It was by the old

4   standard handwritten documents.  And they would go -- they

5   would communicate internally with handwritten documents.  But

6   we believe the average is somewhere between a day to two

7   days.

8           THE COURT:  What -- you mentioned release.  I

9   didn't mean to jump ahead.  But I didn't have a lot of

10  problem with the release, because as I understand the

11  release, it's targeted to this action.

12          MR. WATSON:  That's correct.  We wanted to make

13  sure that we were excluding anybody who had a -- essentially

14  a noncomputer-type claim.  In other words, if you've been

15  incarcerated and you allege now or in the future that you've

16  had lack of medical care, excessive force, things of that

17  nature, those claims are not being released.  In fact, anyone

18  who currently has a lawsuit individually filed based on the

19  computer system, they're not released.  And that is in our

20  brief, Your Honor.

21          THE COURT:  I read the release in the settlement

22  agreement, I think is where I read it.  But in any event, it

23  seemed to me, as I understood it, that the only release was

24  of claims that might have arisen in the course of litigation.

25  In other words, if I had a claim against Tyler, to pick an

**UNREDACTED TRANSCRIPT**

1  innocent entity, for some personal injury in some other

2  context or whatever one could sue Tyler for, I wouldn't be

3  releasing that.

4          MR. WATSON:  That's correct.

5          THE COURT:  Now, the injunctive relief.  I read

6  what I understood to be that.  How does that benefit the

7  class?

8          MR. WATSON:  Well, to the extent that we hope

9  those -- we did that because we wanted them to, quote, fix

10  the problem.

11          THE COURT:  I don't have a problem with the --

12          MR. WATSON:  And --

13          THE COURT:  -- injunctive relief as such.  My

14  question is:  Is it of significant benefit to the class?  It

15  struck me that it would only be of benefit to the class if

16  the class included recidivous.

17          MR. WATSON:  Well, I mean, that's who this class

18  really is.  Quite often these people get rearrested, and that

19  was the concept.

20          THE COURT:  I don't have any -- I don't have any

21  objective basis for making that decision other than my

22  perhaps some of my own experience as a judge.

23          MR. WATSON:  Right.  Well, we had multiple people

24  in the class that, at least from the spreadsheets that we

25  saw, that got rearrested.  So we thought, well, if the county

**UNREDACTED TRANSCRIPT**

1   is willing to offer this injunctive relief, and you may not

2   have to weigh that with respect to the attorney's fees.  This

3   is something they offered.  Because we kept saying if we pled

4   injunctive relief in our case, we want you to take some

5   meaningful steps to prevent this from happening to others.

6             And this was a big bone of contention in the

7   mediation.  And you know at the end of the day, we could

8   certainly provide some evidence at the final approval hearing

9   about recidivous rates and that these will affect the very

10  people that are a part of this class.  But at the end of day,

11  we thought this case really is about liberty.  And it's an

12  important case.  So we want to cure the liberty problems that

13  happened because of the computer system.  And they've taken

14  some steps that legally they don't have to take in order to

15  allow a grievance procedure to go forward and to better

16  ensure that people are not over-detained.

17            THE COURT:  What about the incentive awards?

18  You've got eight people who are supposed to get incentive

19  awards.  These incentive awards are, what, $17,500 each.

20            MR WATSON:  Right.  And --

21            THE COURT:  And that totals about 140,000, and

22  that comes out of the gross settlement amount; is that

23  correct?

24            MR. WATSON:  Yes, sir, that's correct.  Now,

25  there is case law about, you know, how big is your incentive

**UNREDACTED TRANSCRIPT**

1    award.  It has to be in comparison to what claimants would

2    otherwise get.

3              THE COURT:  My interest in the incentive awards

4    will be three or four things:  One, is it a fair amount --

5              MR. WATSON:  Right.

6              THE COURT:  -- relative to other issues, and I

7    just did one that was $10,000; 17 is fine.  It's more or less

8    within the case law.  But whether it's appropriate in this

9    case, I don't know.

10             Number two would be what did these individuals,

11   each individual independently, contribute over a period of

12   years, which may be different from individual to individual.

13   Although they're each getting the same amount.  Now, I know

14   comparison can be invidious, but that raises an issue for me.

15             A third issue is it's coming out of the gross

16   settlement.  So it's coming out of the amount that might be

17   paid to individual plaintiffs.

18             And a fourth issue, I don't know the answer is:

19   Is it in addition to their recovery as plaintiffs?  In other

20   words, the amount they would be entitled to?  So that if

21   named Plaintiff X was entitled to $50,000, would that be

22   50,000 plus 17,500?

23             MR. WATSON:  That's the way the settlement works

24   at this juncture.  Now, we anticipated, obviously, addressing

25   the incentive awards, the propriety of any incentive award,

**UNREDACTED TRANSCRIPT**

1    at the final fairness hearing.  We certainly can address it

2    now.

3              I can tell you that all our plaintiffs

4    participated significantly in the case.  They were all

5    deposed.  They were all prepared.  They all produced

6    documents, and they all answered interrogatories.  In fact,

7    they all reviewed not one, but all seven versions of the

8    complaint.

9              So this was -- we had to, if you will, make sure

10   our lead plaintiffs were not -- were not just sort of lending

11   their name to the case but were active participants.  There

12   is one that we will need to nonsuit who passed away, and

13   there was no administrator who -- to take over.  That's

14   Cortez Brown, but the remainder were active.  They all --

15             THE COURT:  That individual is still getting a

16   recovery under the terms of the settlement; is that right?

17             MR. WATSON:  He's not getting an incentive award

18   because he was not deposed.

19             THE COURT:  He's still getting a recovery.

20             MR. WATSON:  He is --

21             THE COURT:  The estate is getting a recovery?

22             MR. WATSON:  They can make a claim, yes, sir.

23             THE COURT:  The case law sometimes suggests that

24   an incentive award can be a disincentive, or let me put it a

25   different way.  An incentive award can disincentivize a named

plaintiff from caring as much about an appropriate settlement

for other members of the class because the named plaintiff is

being made more than whole.

MR. WATSON:  I understand.  And I will tell the

Court this is not something our clients came to us and said

we got to have this, or we're not going to go do this deal.

This is something we, as their lawyers, recommended and

demanded from the defendants, given their active

participation in the case.

You know, many class actions are sort of a

nominal $5,000 or $2,500.  And the plaintiff doesn't get

deposed, and the case is settled without much to do with the

plaintiff.  But here, you know, all these plaintiffs stayed

with this case for five and a half years.  You know, I was,

to be candid, are we going to lose touch with these folks,

and they were very active in calling us, producing documents.

That's one of the things as a defense lawyer you

always do is I'm going to ride that plaintiff to see if he

really is going to be around to communicate, to respond to

discovery, to produce documents.  So we felt good that that

was a fair number in light of what they would get as a

claimant.

There are cases that say, well, gee, if you get,

you know, a hundred-thousand-dollar incentive award and

everybody gets a $1.50, well, that's not -- you know, that

1    disincentivizes you to proceed far with a fair settlement.

2    We think the terms of the settlement are fair, and it

3    adequately compensates them for representing the class and

4    being as active as they were.

5            THE COURT:  I would say, to the extent I think

6    the settlement is fair and reasonable, that would suggest

7    that the plaintiffs weren't disincentivized.  In other words,

8    the good thing about this case is there's real money in it.

9            It's not a coupon case.  It's not a let me give

10   you some chump change.  It's not those things.  It's not you

11   can get services instead of money.  I'm not uncomfortable

12   with the way the settlement works insofar as there being

13   money there for the class, which then suggests that there's

14   no disincentivization of the plaintiffs, if you're following

15   me.

16           Then the definition of the class, I don't have

17   much difficulty with the nine hours or the way the settlement

18   is structured based as you've described it on days.  One of

19   the questions I had was when the class ends -- well, the

20   first time I read this, it appeared that the class would

21   remain open up against an approval hearing.

22           MR. WATSON:  That's correct.  Now, the --

23           THE COURT:  But then I read something about March

24   of 2021.

25           MR. WATSON:  Well, that's what we -- that's the

**UNREDACTED TRANSCRIPT**

1   number of people that were arrested.  And we did March 21

2   because that's roughly when we came close to signing the

3   settlement agreement, which went through many iterations.  So

4   that number, I'm sure, has grown since -- it will grow to the

5   final fairness hearing.

6          But the defendants demanded, and I would demand

7   if a defense lawyer, look, if we're going to settle this

8   class, we want to make sure we cast a wide net.  Now, if the

9   Court approves the settlement, ultimately, what's nice about

10   it is when the Court -- whenever the Court, if the Court

11   enters the permanent order granting preliminary approval, the

12   claim administrator will publish notice, will set up the

13   website, will make the settlement agreement, the long form of

14   the notice available on the website, the short form of that

15   available.  As well as -- and this is sort of above my pay

16   grade -- will do what's called Internet algorithmic

17   advertising.

18          They get with Google and other search providers,

19   and they load in search terms that will likely bring a banner

20   ad to that person like Shelby County jail.  Then they will be

21   led to the website.

22          In any event, if the Court, ultimately, enters

23   the final order, or excuse me, the order granting preliminary

24   approval, from the time that is done, and notice goes out,

25   and claim forms go out, people can make a claim.  In fact,

**UNREDACTED TRANSCRIPT**

1   they can make a claim not up to the final fairness hearing,

2   but if the Court enters -- once the Court enters the fairness

3   hearing order, if it does, they have an additional 50 days

4   beyond that to make a claim.  So we've got all -- depending

5   on when Your Honor sets a fairness hearing and depending on

6   when you enter an order on this case at all, there's going to

7   be a long period of time where people have the availability

8   to make a claim.

9            THE COURT:  I'm not as concerned about the timing

10   for the filing of claims as I am the definition of the class.

11   If I haven't defined the class in advance of the final

12   approval hearing, how do I know who's in the class?  That's

13   what I was concerned about as I read through.  I thought I

14   might have misread it.  You can't -- I don't think I can

15   define a class in terms of a final approval hearing.

16            MR. WATSON:  Well, perhaps we just need to pick a

17   date and cut it off if that's -- maybe we cut it off today.

18            THE COURT:  I think we might have, and I don't

19   remember the date that I saw.  I'm presuming --

20            MR. WATSON:  March the 21st is what you were

21   mentioning, Your Honor.

22            THE COURT:  That's the number that leapt out at

23   me when I was trying to figure out what was going on for

24   purposes of the definition.

25            MR. WATSON:  Right.

**UNREDACTED TRANSCRIPT**

1          THE COURT:  That wasn't -- that seemed to me

2    different from what I had read elsewhere that suggested a

3    final approval hearing date.  And I'm not certain at this

4    juncture where I pulled those numbers.

5          MR. WATSON:  Well, where you pulled the 21st,

6    Your Honor, was in our brief where we said there were 72,790,

7    I believe, folks that had been incarcerated from November 1

8    through that date.

9          Now, the defendants wanted a release all the way

10   through the final fairness hearing.  So, you know, obviously

11   that would be a change to the settlement.  I have no problem

12   with that.  We'd have to ask the county and the defendants if

13   they're happy with that.

14         THE COURT:  I doubt that they have any grave

15   difficulty with it given that it would potentially reduce the

16   size of the class, but I'm not representing any of those

17   people.

18         MR. WATSON:  Well, of course not.  I don't --

19   I'll pose that question to the group.  I mean, obviously,

20   people that were over-detained after March 21 would not be

21   included in the class.  I just don't think that's happening

22   at this stage of the ball game.

23         THE COURT:  I thought you suggested that

24   over-detention ended a substantially longer period ago than

25   that.

**UNREDACTED TRANSCRIPT**

1    MR. WATSON:  Oh, it did.  It did.  I mean --

2    THE COURT:  What are we losing?

3    MR. WATSON:  Well, the defendants wanted a broad

4  release.  They demanded that.

5    THE COURT:  I understand.  In other words, the

6  issue is that the defendants would like a larger class for

7  release purposes.

8    MR. WATSON:  That's correct.

9    THE COURT:  All right.  What do you have to say,

10  Mr. Horton?

11    MR. HORTON:  Your Honor, we don't have an

12  objection to the March 21 cutoff date, if that's what the

13  Court wants to do.

14    THE COURT:  That's the question I have.  I think

15  it's a more of a logistical issue than any other thing.

16    MR. WATSON:  It's a practical issue, yes, sir.

17    THE COURT:  Anybody else.  Mr. Trammell?

18    MR. TRAMMELL:  We agree, Your Honor.

19    THE COURT:  Anyone have any objection to the

20  March 21st date?  I'm not going to call all your names.

21  Although -- and I might not remember all of them, but I have

22  them written down.

23    What are you doing over there, Mr. Craddock?  Did

24  you come for ornamental purposes?

25    MR. CRADDOCK:  I'm here because Mr. Horton needed

**UNREDACTED TRANSCRIPT**

```
 1  someone to bring his briefcase.
 2             THE COURT:  You know, it would be always a
 3  privilege to carry Mr. Horton's briefcase.
 4             MR. CRADDOCK:  Yes.
 5             THE COURT:  All right.  Well, there's one issue
 6  out of the way.
 7             Let's talk about -- well, one of the things that
 8  I -- is somewhat unusual in my experience is both a claim
 9  process and an opt-out process so that only people who are
10  going to be included, ultimately, who filed claims as I
11  understand it.  No claim, no recovery.  But you can also opt
12  out or not opt out.  And, presumably, if you opt out, you're
13  not releasing.  But it's a two-track process as I understand
14  it.  And the opt-out also triggers the possibility of the
15  termination, if it reaches a certain percentage.  Is that a
16  fair analysis?
17             MR. WATSON:  That's correct.  I mean,
18  typically -- I mean, in this case, while we did ask for
19  injunctive relief, the Sixth Circuit case law is pretty clear
20  that the predominant relief that we're seeking and the
21  predominant relief we're providing to the class is monetary.
22             So, as a result, you cannot have a nonopt-outable
23  class.  This would be a Rule 23(b)(3) class, not a (b)(1)(A),
24  (b)(1)(B), or (b)(2).  As a result, they have to have the
25  right to opt out if they want to.
```

**UNREDACTED TRANSCRIPT**

1          Now, you know, most defendants say, and it makes

2    sense, that, gee, if you have a large number of opt-outs,

3    that deflates the purpose of our settling, and at some point,

4    we're just going to say we're going to go back to square one.

5          Now, Your Honor, we've indicated in our brief

6    that we've come to a confidential -- hopefully confidential

7    number.  We certainly can tell the Court, but we don't want

8    other lawyers doing this.  Opting a bunch of people out, and

9    then coming and saying, I'll withdraw my opt-out if you -- if

10   you -- we can extract some sort of economic concession from

11   you.  So, but yes, there --

12          THE COURT:  Mr. Watson, who would do a thing like

13   that?

14          MR. WATSON:  I've had it happen.  Maybe me.

15          THE COURT:  They used to call it a shakedown

16   cruise, but anyway, that was a long time ago.  Your secret is

17   safe with me, because I don't know it.  And probably just as

18   well.  I don't need to know it.  It doesn't have any material

19   impact on my view of the merits of the settlement.  It's just

20   a matter -- internal matter for the parties.

21          MR. WATSON:  Yes, sir.

22          THE COURT:  You know, what's the old saying, how

23   do you keep a secret?  Never tell anyone.  That's the --

24          MR. WATSON:  Well, we think, actually, it's been

25   met.  I mean, a lot of the lawyers sort of got going about

1   this.  Well, criminal defense lawyers.  But what we've heard

2   in the community, people are happy with this.  And like I

3   said, just before I came, we've been flooded with phone calls

4   about -- they think the final approval is today.  Can I get a

5   claim form?  And, you know, that kind of thing.  So, I think

6   it's going to make -- meet with good reception with the class

7   members, if notice goes out.

8           THE COURT:  Let's talk about notice, which, as I

9   understand it, is exclusively by publication.  A couple of

10  Sundays in the local newspaper, which is *The Commercial*

11  *Appeal*.  A couple of Sundays in the *Tri-State Defender*, and a

12  couple of Sundays somewhere else.  I don't recall.  But --

13  and then some Internet activities, and that's it.

14          MR. WATSON:  Right.  Right.  That's correct.  You

15  know, Mr. Burns and I've done this before with a great

16  success in a case called, you know, Werner Ladder out in

17  Washington.  We had a case where it was an defective ladder

18  that was sold by Home Depot, but there were no records of

19  actually who owned the ladder.  And so we had the choice of

20  doing some publication, but really the Internet is the way to

21  get people today.

22          Now, why not send out 72,000 mail-out notices?

23  Well, the answer -- Mr. Whitwell has given a lengthy

24  declaration about why that's not going to be very helpful.

25  As we're --

**UNREDACTED TRANSCRIPT**

1      THE COURT:  Fraud.  It could create fraud.  I

2 wasn't so persuaded by --

3      MR. WATSON:  I don't know about fraud.  I'm not

4 that worried about fraud.  What I'm worried about --

5      THE COURT:  You can get fraud anyway you want to

6 go.  You can get fraud by publication.  You can find fraud

7 under the rock.  I really wasn't --

8      MR. WATSON:  Right.  But the notice is going to

9 be also posted, Mr. Burns reminded me, at the jail.  The

10 claim forms can be obtained on the website, printed off.  The

11 notice -- the long form and the short form will be on the

12 Internet site.

13      But here's the issue with that kind of notice is

14 that:  One, these people are scattered to the winds.  They're

15 not -- those addresses are more than likely not going to be

16 good.  Number two, the cost of doing that.

17      Okay.  So now the government has decided that

18 mail-out is $0.58 a letter.  Then you have publication, or

19 printing cost, and handling cost.  So you're going to look at

20 another $150,000 that could be going to class members.  So we

21 thought --

22      THE COURT:  You estimated 33,000 based on?

23      MR. WATSON:  Well, that was on the 46-cent stamp.

24 Now, that estimation didn't include, you know, printing and

25 actually handling and stuffing those envelopes or

**UNREDACTED TRANSCRIPT**

1    mechanically getting that done and going out.

2                 Now, keep in mind, the claim administrator here,

3    who do we have or who do we propose?  It's CMM Settlement

4    Solutions.  Mr. Burns and I used them in the past.  We've

5    used them with D. P. Marshall over in Jonesboro in an ERISA

6    case.  In fact, he came to testify.  And I wish I had the

7    transcript.  The judge said where did you find this guy?

8    He's really good.  And he's cost-effective.  He's got a team

9    of folks out in Bartlett that do this.

10                 But we put this out for bid.  Okay.  We put it

11   out for bid to handle the claim administration.  They all --

12   and Mr. Burns actually handled that, and maybe you can say

13   something.

14                 MR. BURNS:  Sure, Your Honor.  The biggest

15   problem that we encountered trying to get a bid on this is

16   nobody wanted to give you a flat fee to handle it.  We would

17   get a lot of proposals.  They wanted to charge hourly rates

18   or a per-piece type charge, and the Court knows where that

19   ends up.  You know, if you're getting charged hourly rates

20   for handling phone calls from class members, at the end of

21   day we could have gotten a million-dollar bill from a claim

22   administrator service.  And we've actually seen that.

23   Luckily, we weren't paying what Mr. Watson was referring to

24   in that Werner Ladder matter.

25                 The claim administration bill was handled that

**UNREDACTED TRANSCRIPT**

1    way, and it was staggering how much they charged.  So we had

2    to find folks that would bid it on a flat-fee basis, and

3    that's hard to do.  Most of them will just not lock in.  And,

4    in fact, I think I submitted proposals from five folks.  Two

5    of them just refused to bid it.  The others, this was about

6    half of the other bids that we got.  So they're pretty cost

7    effective.

8              But the other point I wanted to make on the

9    mail-out Mr. Watson is talking about, we had a lot of

10   discussion about this issue with defense counsel.  And if we

11   can only mail out to the 3,500 folks that we thought were

12   over-detained --

13             THE COURT:  I'm persuaded you can't do that.

14             MR. BURNS:  You can't do that.  That's the

15   problem.  That's the problem.

16             THE COURT:  I'm not entirely persuaded you can't

17   mail to the 72,000.

18             MR. BURNS:  Right.  Right.  That's the issue.

19             THE COURT:  That's -- the reason is in almost

20   every case, mail is superior to publication.  That's how it

21   is.  Now, sometimes publication is necessary because mail is

22   not practical.  But I'm not entirely persuaded that's this

23   case.

24             My goal is simple.  How do you get information

25   about a substantive settlement to as many class members as

**UNREDACTED TRANSCRIPT**

1  possible?  How do you reach people?  And how do you figure

2  out who those people might be?  How they think.

3             And I understand that there's a lot of waste

4  effort, or expense, because, I mean, you're at 301 Poplar.

5  This case is about lousy recordkeeping, among other things.

6  And so what kind of records do you have?  How do you --

7  you've got a lot of bad addresses.  And some of the bad

8  addresses have nothing to do with lousy recordkeeping

9  because people get booked in.  They've got -- they may have

10  their identification, they may not.  They give false names

11  and false addresses.  It's a difficult problem.

12             Then you've got people who move around a lot.

13  You know, you've got people who have been incarcerated, and

14  who are -- who simply move among cities, but within a city.

15  Do not have set residences.  You've got homeless people;

16  you've got transients.  You've got a whole world of people

17  you can't reach easily, and perhaps you can't reach at all.

18             The question is how -- where does -- is that

19  population going to be looking, and how do you get to them?

20  Are they going to wake up every morning and read *The*

21  *Commercial Appeal*?  Is that their -- is that their prime

22  source of information?  Are they all going to be hooked up to

23  the Internet to pick up some Internet site that's going to be

24  blasting information about the settlement?  Can you reach

25  most of them with some kind of mail?

1          I don't have an easy answer to it.  If I had an

2     easy answer, I wouldn't ask the question.

3          MR. WATSON:  I would say Your Honor should take

4     judicial notice that every time somebody is asking for money

5     on the corner, they seem to have a cell phone.  I'm just

6     saying.

7          MR. BURNS:  Your Honor, if I may try --

8          THE COURT:  I agree that there are a lot of

9     phones out there in the world.  I mean, somebody will be on

10    the phone and stick out a hand for a contribution.  But I'm

11    not sure -- it depends on how you reach through that medium,

12    and what source you have for that medium.

13         I'm relatively confident that a couple of Sundays

14    in a few publications, and something on the Internet won't

15    work.

16         MR. BURNS:  Your Honor, let me speak to the

17    Internet.  And I won't be able to properly explain it, but I

18    dealt with --

19         THE COURT:  If you properly explain it, I

20    probably couldn't understand.

21         MR. BURNS:  But CMM spent a lot of time with me

22    trying to explain the banner ad phenomenon.  And they felt

23    like it would be fairly effective.  And the way I understand

24    it -- and it's slightly spooky -- but apparently, they can go

25    to Google ad words and different companies like that, and

**UNREDACTED TRANSCRIPT**

1   then they can set their demographic parameter, their

2   geographic parameter, and specific people that they're trying

3   to target with these ads.  And based upon that, Google,

4   through some sort of dark-art algorithm, will place those

5   banner ads on places that that demographic and that location

6   are likely to visit.

7              We've probably all experienced this.  If you're

8   looking for something in particular, you start getting banner

9   ads.  You know, if you do a search for something, those ads

10  start appearing.  I think that's what we're experiencing.

11             THE COURT:  If I search for bail bondsman, it

12  would --

13             MR. BURNS:  Exactly.  Or criminal defense lawyer.

14  I suspect you're going to get a banner ad that if you were

15  over-detained at the jail whatever that ad says, it will link

16  you to it --

17             THE COURT:  I'm glad to know about it.

18             MR. BURNS:  Right.  And so we can get some sort

19  of declaration with a better explanation from CMM, which is

20  an expert on that.  And maybe file it with the Court, so the

21  Court has a record of that because I'm not qualified.  But

22  that's my understanding of how it works.

23             I think the Court -- in fact, Mr. Watson and I

24  were talking about it.  We would suspect for bail bondsmen,

25  criminal defense lawyers, things of that nature that maybe

**UNREDACTED TRANSCRIPT**

1   this demographic in this location would look for, that's

2   where those ads will pop up.  They seem to think it's very

3   effective.

4           THE COURT:  Where are the publications supposed

5   to be?

6           MR. BURNS:  I know *Commercial Appeal*.

7           MR. WATSON:  *Commercial Appeal.  Tri-State*

8   *Defender*, Your Honor.

9           MR. BURNS:  And what was the third one?

10          MR. Watson:  *Memphis Flyer*.

11          MR. BURNS:  *Memphis Flyer* was the third one.

12          THE COURT:  Did you miss the daily news in there

13  somewhere?  I say that because one way to reach people may be

14  through lawyers.

15          MR. BURNS:  Well, that's why we posted it -- we

16  were proposing to post this at the courthouse as well.  And I

17  will say -- how we got those three publications is we

18  recently were involved in a class action -- Mr. McLean was

19  involved in it -- related to the Galilee Cemetery.  And you

20  had -- it was in Shelby County here as well a similar type

21  demographic.  And we published --

22          THE COURT:  When you did that case, did you do

23  mail notice?

24          MR. BURNS:  We didn't have addresses for

25  everybody.  So we mailed to the folks that we had good

**UNREDACTED TRANSCRIPT**

1    addresses for, and then we did publications in these three

2    publications.  And I'll tell the Court we had a huge claim

3    rate.  It hasn't been paid out yet, but we had probably

4    60 percent of the folks that we believe were -- half the

5    class members made claims.  So . . .

6              THE COURT:  You did mail?

7              MR. BURNS:  Well, to some people.  We did very

8    limited mail, because we only had addresses for limited

9    folks.  But there were a lot of folks that were involved that

10   we didn't have addresses for, and that's where the

11   publications came in.

12             MR. WATSON:  The way that settlement worked is

13   you mailed notice to people who had a contract with the

14   funeral home.  You knew who those were.  But the

15   heirs-at-law --

16             MR. BURNS:  Were unknown.

17             MR. WATSON:  -- were unknown.  And so you had to

18   really publish the case there because not just the contracted

19   party can make a claim, but an heir-at-law can make a claim.

20             So, well, you know, at the end of the day, the

21   rule requires adequate notice for people to be able to be

22   informed of their rights; and, you know, we hear in court --

23   you know, we thought about this.  We talked about it a lot,

24   and it was -- it was partly a money thing from coming from

25   the claim pool.  But at the end of the day, you know, if we

                    **UNREDACTED TRANSCRIPT**

1    need to do something additional, I'm open to it.  I mean,

2    maybe rather than a -- you know, rather than a full-length

3    letter with a claim form and the settlement notice, I've

4    frequently gotten just a little postcard.  Just a little --

5              THE COURT:  Send a postcard with your website.

6              MR. WATSON:  Right.  That's what I've gotten from

7    federal lawsuits before.

8              THE COURT:  That's one possibility.

9              MR. WATSON:  Well, that would be --

10             THE COURT:  You say you're posting notices at the

11   courthouse.  Are you posting notices at the jail?

12             MR. WATSON:  Are we doing that?

13             MR. HORTON:  I think we're agreeable to that,

14   yeah.

15             MR. WATSON:  It was not a condition of the

16   settlement.  We asked about that, but --

17             MR. BURNS:  I wasn't really distinguishing

18   between the two.  201, the jail is at the bottom, right?

19             MR. WATSON:  Right.

20             MR. BURNS:  Okay, yeah.  But --

21             THE COURT:  Which is, 201 what?

22             MR. BURNS:  Well, from my perspective, when we

23   said we were going to post it at 201, I assume that meant the

24   courthouse and the jail since it's in the bottom of 201.

25   But . . .

**UNREDACTED TRANSCRIPT**

```
 1              MR. WATSON:  We figured the jail --

 2              THE COURT:  The courthouse, when you say

 3    courthouse to me, I'm in James Gamble Rogers Building.

 4              MR. BURNS:  Okay.  201 Poplar is where we're

 5    talking about.

 6              THE COURT:  The county courthouse.  I was trying

 7    to figure out who wandering through the Shelby County

 8    Courthouse would benefit from this notice.  Now I understand.

 9              MR. BURNS:  Okay.

10              THE COURT:  We're talking about the whole complex

11    down there, including the jail?

12              MR. BURNS:  Yes, Your Honor.

13              THE COURT:  Well, I guess what I'm thinking is

14    that somewhat more extensive publication.  That is another

15    date or so plus adding a daily news or some publication that

16    goes to criminal defense lawyers would be helpful, and maybe

17    the postcard thing depending on what the cost is.

18              I mean, I'm in a case where it's a $4.9 million

19    gross amount, 2.4 million settlement amount, potentially, one

20    way or another, and $140,000 would be paid to the named

21    plaintiffs.  We wouldn't break my heart to see $150,000 go

22    out to try to reach people assuming that's necessary or

23    productive, which I don't know the answer to.

24              I would rather not spend $150,000.  There must be

25    some smaller way you can mail to 72,000 people to say check
```

**UNREDACTED TRANSCRIPT**

1   this website.

2           MR. WATSON:  The postcard, well, that could be a

3   lot cheaper.  I would have to check.

4           THE COURT:  I'm concerned about actual notice to

5   people who might be able to recover and won't be able to

6   recover.  And I'm not suggesting it's easy or that what I

7   just suggested is right.  It may not be the correct means of

8   proceeding.  I just -- I need a higher level of comfort than

9   I have today that the potential class members will be

10  notified.

11          MR. HORTON:  Your Honor, may I speak just on the

12  mailing just for a moment?

13          THE COURT:  Yes, Mr. Horton.

14          MR. HORTON:  We, Shelby County, you know, the

15  document and the spreadsheet that Mr. Watson has talked

16  about, there are a number of inaccuracies, especially in the

17  address part.  I think the Court has already realized that.

18  There are homeless people there.  And then I think one

19  additional part that the Court has not done, stated, but it's

20  in Mr. Whitwell's affidavit, is there are people that have

21  had their cases or about to have their cases expunged.

22          So when you start mailing out a number of

23  different pieces of mail to a last known address, or some

24  future address, or address that we're trying to find through

25  the claims administrator, and I'm trying to get my case

**UNREDACTED TRANSCRIPT**

1   expunged, because I've had a DUI or some other minor offense,

2   when my case is expunged, it could end up in the wrong hands.

3   And so there's that possibility that I'm trying to get my

4   case expunged, all the sudden my colleague or someone else

5   finds out about it, and then I've got some issue with my

6   employer somewhere else.

7         So we have some of the same concerns that the

8   Court's talked about along with that.  And unfortunately,

9   Your Honor, we just think -- it's our position that mailing

10   out 72 -- almost 73,000 pieces of mail for 3,500 people,

11   respectfully, is going to be not cost effective.  And based

12   upon all the factors that we've talked about, the Court has

13   mentioned, and in Mr. Whitwell's declaration, we just think

14   that that money could be spent otherwise either in the class

15   settlement and not go to mail-out.

16         Now, if there are other ways, we're not objecting

17   to what the Court has talked about, maybe sending something

18   to criminal defense lawyers or something like that.

19   Obviously, that's a good suggestion I think we could

20   obviously live with, but I think just mailing out 73,000

21   pieces of mail would not be productive.

22         THE COURT:  Not productive in one sense.  It

23   wouldn't reach more people than we would reach otherwise?

24   It's too expensive?  It compromises individuals' privacy?

25   It's hard to imagine exactly how that happens, but I guess it

**UNREDACTED TRANSCRIPT**

1    could under certain circumstances.  What's the specific

2    objection?

3                MR. HORTON:  Well, we just -- we believe that

4    there are other -- maybe there are other ways of publication

5    that would accomplish the same goals as mailing out and would

6    be more effective.

7                THE COURT:  That's possible.  I'm not sure I'm

8    persuaded, but it's possible.  I haven't heard one.  That's

9    what's causing me pain.  What do you say --

10               MR. HORTON:  And, I guess, what I -- just

11   talking -- the other part is that someone has got to go and

12   try to gather all that information up, and so we --

13               THE COURT:  Are you saying that it's impossible

14   for the county to produce the names of the people -- all the

15   people who are incarcerated during this period?

16               MR. HORTON:  No, sir, we're not saying that at

17   all.  What we're saying is that the information, which may be

18   on the list as far as addresses go, may not be accurate.  And

19   then we've also had a number of -- when we've looked at the

20   list, there obviously jumps out -- there are a number of

21   inaccuracies at the that list jump right out at you that are

22   in error.

23               THE COURT:  If you can -- well, I would suggest

24   two things:  One, if they jump out at you, and it's obvious,

25   you don't have to use them.  Two, is you mail and you

**UNREDACTED TRANSCRIPT**

1    understand that a great number of those mailings are not

2    going to an appropriate address.  They don't go to the

3    appropriate address.  And, of course, the vast majority of

4    them will be wastage in a sense that it appears, best

5    estimate or good-faith estimate, that you're only dealing

6    with 3,500 people in the first place.  I simply haven't heard

7    a way of -- that I'm satisfied with that tells me that we're

8    going to get most of those 3,500 people in the door.

9                 Anyway, Mr. Trammell?

10                MR. TRAMMELL:  Your Honor, may I address that?

11                THE COURT:  You can sit down and speak into the

12   microphone.

13                MR. TRAMMELL:  You said it would be wasted.

14                THE COURT:  I said there's potential wastage, I

15   think, if that's --

16                MR. TRAMMELL:  Right.  Right.  Right.  But I

17   think what those that are -- the waste may come in the

18   county's time and the administrator's time in people who

19   would submit claim forms that aren't part of the class that

20   would make it so that even though they submitted the claim

21   form, they were never part of the class.  They were just part

22   of the 73,000.

23                Then the county has got to go and pull their

24   records because we've got to make sure that these people are

25   entitled to a benefit.  The county has got to pull all of

**UNREDACTED TRANSCRIPT**

1    those records, take a look of them, then send them to the

2    administrator.  The administrator has got to make a

3    determination.

4              And let's just say 10 percent submit them that

5    have no business submitting a claim form, because they are

6    not a claim member.  That's 70 -- what, 7,300 files that have

7    got to be pulled.  Some are hard copy.  Some are computer.

8    And then it's got to go to the administrator to take a look

9    and realize these people were never in the class in the first

10   place.

11             So there is a huge burden of time and money and

12   expense for 30 -- when we know there's really only 3,500

13   people.  Does that make sense?

14             THE COURT:  It makes perfect sense, but how do

15   you get to them?

16             MR. BURNS:  Your Honor, might I suggest this,

17   that we all get together and try to come up with a revised

18   plan.  What I'm thinking out loud here is maybe we can try to

19   isolate the 3,500 that we think, and then get with CMM, and

20   see if we can do some sort of postcard notice to those folks

21   only.

22             THE COURT:  As I understood the declaration, was

23   it a Mr. Whitwell?  Anyway, there was a declaration somewhere

24   that said that couldn't be done, or it couldn't be done in

25   any effective way, cost-effective way.

**UNREDACTED TRANSCRIPT**

47

1          MR. BURNS:  If we limit it in time -- and I know

2     that we've had some discussions about not doing that because

3     you didn't want anybody to come back in and say I didn't get

4     written notice; therefore, I'm not bound by this.  And, so,

5     then you go back to you got to send a universal 72,000

6     people, which is not cost effective.  But if we could still

7     do publication notice and still bind everybody that we intend

8     to bind, but only do a mail-out to the time period of the

9     folks that we think are really in the class, the 3,500, then

10    maybe that gets everybody satisfied.  I don't know.  I don't

11    presume to know what the Court would allow but . . .

12         THE COURT:  Mostly to satisfy me if I think

13    people are getting actual notice.

14         MR. BURNS:  Right.

15         THE COURT:  Or the best effort has been made for

16    people to get actual notice.

17         MR. BURNS:  Right.  We could certainly resubmit

18    something to the Court after we get together when we get with

19    CMM, and we see if that's feasible to do that.  And let the

20    Court know what it would entail and cost.

21         THE COURT:  I like that.  Kick the can down the

22    road.

23         MR. BURNS:  Perfect.

24         THE COURT:  My favorite methods.  Anybody object

25    to that proceeding?

**UNREDACTED TRANSCRIPT**

1          MR. HORTON:  No, Your Honor.

2          THE COURT:  Mr. Horton.  We finally got

3   Mr. Horton back at the table.

4          All right.  I think we've exhausted the notice

5   issue.  You know what my concerns are.  I'm interested in the

6   best practical notice.  And I want to know at the end of the

7   day that if there are people out there who are entitled to

8   recover, they know they're entitled to recover.  And I

9   understand it's not a neat or orderly process, but we need to

10  figure out what the best one is and not leave it to the

11  parties.  If I have a brainstorm, I'll let you know.  It

12  never has happened in my entire life, but it might be a first

13  time.

14         Let's see what else I want to talk about.  Oh,

15  fees.  Here -- of course, I don't have a fee application.  So

16  I have nothing to evaluate.  But it's not a bad time, at

17  least initially, to talk about fees.  I've got a proposed

18  recovery of 4,900,000, or a gross settlement amount, if you

19  will, of 4,900,000.  And a proposed attorney fee of, what is

20  it?  240, did I say earlier?

21         MR. WATSON:  Well, when Your Honor gets our

22  application, the attorney time will be roughly two two, the

23  expenses will be roughly --

24         THE COURT:  All right.  All right.  Let's slow

25  down, and let's go through it in a way -- I hesitate to use

**UNREDACTED TRANSCRIPT**

1   the word think, but in the way I try to analyze these things.

2   When I get your application, it will include hourly rates,

3   individuals who worked, the time allocable to each

4   individual.  So I will have a time spent, fee-basis hourly

5   rate.

6                MR. WATSON:  It will be a lodestar, yes, sir.

7                THE COURT:  I'm not -- well, lodestar, I don't

8   know.

9                MR. WATSON:  Well --

10               THE COURT:  I mean, it's -- it's a --

11               MR. WATSON:  With no multiplier.

12               THE COURT:  It's -- the initial part of it will

13   be -- not really a lodestar.  It's an hourly charge.  It's a

14   modified lodestar, if you will.  Because what's going to

15   happen is, I think, you're going to submit your fee bill with

16   individuals, hourly rates, something about each individual,

17   and hours spent.

18               MR. WATSON:  Right.

19               THE COURT:  And I never -- I don't usually, in a

20   case like this, look for work descriptions and all that.  I'm

21   not -- unless I need to.  I'm not going to go back over all

22   that.  I've rarely felt the need for that.  It raises some

23   difficult attorney-client privilege issues.  You know, what

24   were you doing?  Well, I was researching this issue.  Well,

25   whoever wanted the other side to know that you were

1   researching that issue.  They didn't know that was an issue.

2   Anyway, so, I don't usually do that.  And I begin with -- I

3   like to begin with that if I can.

4             MR. WATSON:  Yes, sir.

5             THE COURT:  Your representation was that you had

6   a couple of hundred thousand dollars in out of pocket.

7             MR. WATSON:  That's correct.

8             THE COURT:  Which you're going to show by

9   category.

10            MR. WATSON:  Yes, sir.

11            THE COURT:  And then you're going to show the

12  dollars, the rates, the hours, and the dollar amounts.  And

13  that amounted to -- you made a representation just a minute

14  ago that I thought I heard; is that right?  No, you didn't.

15  How much time you -- the value of the time spent.

16            MR. WATSON:  Correct.

17            THE COURT:  What was that?

18            MR. WATSON:  $2.2 million.

19            THE COURT:  So your value time spent is

20  $2.2 million.  If you can establish that, you're unlikely to

21  have difficulty unless I decide that time -- a substantial

22  part of that time was unjustified.  And I wouldn't decide

23  that based on any -- it's unlikely I would decide that based

24  on the hourly rates being unreasonable or the time spent

25  being unreasonable except to the extent that the question

**UNREDACTED TRANSCRIPT**

1   would be what were the results obtained.

2              MR. WATSON:  I understand.  Well, Your Honor,

3   we --

4              THE COURT:  And the lodestar is very difficult to

5   apply in this case because of the percentage of the time

6   spent or the fee related to the -- the gross settlement

7   amount.

8              MR. WATSON:  Correct.

9              THE COURT:  So it's a very high percentage.

10             MR. WATSON:  Right.  We're --

11             THE COURT:  And, also, I don't know whether that

12  will be the actual payout.  Because I want to look at the

13  benefit to the class, and the benefit to the class might, in

14  part, be the injunction.  But it's not going to be that

15  material, I don't think, for this class.

16             Then the question is the payout would be the

17  other benefit to the class.  What is that -- what does that

18  payout amount to, and nobody knows.

19             MR. WATSON:  Well, on the fee application, we --

20  in addition to that, I've already spoken to Gerard Strauss,

21  and he's going to review our information and opine --

22             THE COURT:  Is he an objective third party?  As I

23  recall, he's been known to represent a plaintiff or two.

24             MR. WATSON:  Well, that's why we called him.  So

25  he'll opine about the reasonableness of the fees.

**UNREDACTED TRANSCRIPT**

1    THE COURT:  You're going to bring in some

2 hard-core, old defense lawyer?  Never mind.  Go ahead.

3    MR. WATSON:  So we'll have that outlined for the

4 Court.  But, you know, at the end of the day, this case

5 was -- it was a labor of love.  There was a lot of time

6 spent.  You know, of course, that's why there's a

7 fee-shifting statute available.

8    THE COURT:  I don't doubt that a lot of time's

9 been spent.  This is probably my oldest civil case, probably

10 by a year or two.

11    MR. WATSON:  Oh, wow.

12    THE COURT:  I don't usually have a case that

13 lasts this long.  But it's been a complicated case.  A lot of

14 time spent.  I don't -- unless somebody tells me something,

15 I'm not concerned about fraud arm's length and all those

16 things.  I mean, it seems to me to have been a vigorously

17 contested matter.

18    MR. WATSON:  Well, it was.  We mediated for, I

19 believe, four days with John Garwin (phonetic), starting in

20 November of --

21    THE COURT:  You put up with John Garwin for four

22 days?  John Garwin put up with you for four days?

23    MR. WATSON:  Well, he bills by the hour too, Your

24 Honor, so . . .

25    THE COURT:  Well, that's true.  You can put up

**UNREDACTED TRANSCRIPT**

1   with a lot if somebody pays you.

2            MR. WATSON:  So, we had many, many -- four

3   meetings with him over the course of May through, I believe,

4   February.  And then we had a few telephone calls from him

5   when we started crafting a settlement agreement, which went

6   through a lot of iterations.  But . . .

7            THE COURT:  It's just one of those cases where

8   lodestar doesn't work especially well, I think.

9            MR. WATSON:  No, no.  Maybe I misspoke.  I

10  understood lodestar to be just a simple hourly calculation of

11  your time.  And then some courts say you can --

12           THE COURT:  You use a modified lodestar to

13  check -- if you're going on a time basis, you can use a

14  modified lodestar to check against the time.

15           MR. WATSON:  Right.

16           THE COURT:  And then the question becomes:  Is it

17  the actual recovery or the potential recovery.  I think it

18  should be actual recovery.  There are cases, Boeing and

19  others, I think, that say arguably that's potential recovery.

20  Anyway, you've told me what I need to know at the outset.

21  That is there's at least a chance that the fee is reasonable.

22           MR. WATSON:  That's good to know.

23           THE COURT:  I don't want to -- I'm not expressing

24  any opinion about any of these issues.  I'm just trying to

25  educate myself.  And the fee, of course, is one of the things

                    **UNREDACTED TRANSCRIPT**

1  that leapt out at me.  Where I don't want to be at the end of

2  the day is to have a case where not many people ended up

3  participating, not much money got paid out.  In fact, most of

4  the non-attorney fee money reverted to the defendants, but I

5  have a $2,400,000 attorney fee.

6          MR. WATSON:  Right, I understand.

7          THE COURT:  That would make me uncomfortable.

8          I think that's my list of issues.  I'm sure I'll

9  think of more.  When are you planning to submit your fee

10 requests?

11         MR. WATSON:  Well, that would be filed, I think,

12 30 days before the final fairness hearing, Your Honor.

13         THE COURT:  You might want to --

14         MR. BURNS:  It all hinged off when the Court

15 entered the preliminary order, and then there are time frames

16 that the order set out.

17         THE COURT:  Well, I'd like for people in the

18 notice to know -- to be fully informed about the settlement,

19 let me put it that way.

20         MR. WATSON:  Oh, no.  The notice sets forth the

21 fees that will be applied for.  That's under the rule.

22         THE COURT:  I understand that.  But -- well, it's

23 okay.  I'll think about it.  The sooner you get your fee

24 application in the better.

25         MR. WATSON:  Sure.  That's not a problem.

**UNREDACTED TRANSCRIPT**

1          Should we reconvene?  I don't want to let a lot

2     of grass grow under this.

3          THE COURT:  You don't want to do what?

4          MR. WATSON:  I don't want any grass to grow under

5     this case.  Can we just say we'll come back sometime in the

6     future?  Who knows when that'll be.

7          THE COURT:  I'm not saying we'll come back.  I

8     don't intend -- unless I have further questions, I will

9     not -- we will not convene again.

10          MR. WATSON:  Okay.  Yes, sir.

11          THE COURT:  No.  My -- if -- once I've gone back

12     through this -- unless -- well, my approach to these matters,

13     in general, is if I have a number of concerns, we get

14     together and talk about them.  If it's impossible to fix it,

15     I reject it at the outset.  If it's -- if it's an easy one, I

16     go ahead and do a preliminary approval without a hearing and

17     we run.

18          This came in the middle for me.  It's a -- there

19     are many good aspects of this settlement, including the fact

20     that it's a settlement.  It's not an easy case at any level.

21     And so -- and by any level, I mean, it's simply the facts of

22     it are so complicated.  Mr. Horton and Mr. Trammell pointed

23     out a number of issues that there are simply logistical

24     issues that make the case extremely difficult to resolve, and

25     then for any settlement to be executed.  So I understand all

**UNREDACTED TRANSCRIPT**

56

1  that.  If it were easy, it would have been done a long time

2  ago.

3          So my intention is to enter an order.  But if I

4  come up against other issues in the course of preparing that

5  order, we'll get back together.

6          MR. WATSON:  Yes, sir.

7          THE COURT:  Now --

8          MR. CRADDOCK:  Your Honor, could I ask a question

9  on this?

10          THE COURT:  So you've come to life over there.

11          MR. CRADDOCK:  I know.  I woke up over here.

12          THE COURT:  Mr. Craddock, I didn't mean to wake

13  you.  Go ahead.

14          MR. CRADDOCK:  I -- as I recall, Mr. Burns and

15  our side propose we get back with Your Honor about the

16  notice.  What we can do is --

17          THE COURT:  You're right, Mr. Craddock.  You

18  weren't asleep.  I was asleep.

19          MR. BURNS:  If we could have a week, Your Honor,

20  I think --

21          THE COURT:  Well, what I'd like for you to do is

22  submit -- I would like for you to submit something in writing

23  rather than have us reconvene.  And I don't know how much

24  time you want to do that.

25          MR. BURNS:  I would think a week.

**UNREDACTED TRANSCRIPT**

57

1      MR. WATSON:  A week would do it.

2      THE COURT:  All right.  Mr. Trammell?

3      MR. TRAMMELL:  My wife will shoot me if I agree

4  to anything in a week, because we're heading on vacation.

5      THE COURT:  Well, much more significant than

6  that, Mr. Trammell, your wife would shoot me.

7      MR. TRAMMELL:  Yes, Your Honor.

8      THE COURT:  Something I would very much regret.

9  And she might even send her mother to shoot me, which would

10 be --

11     MR. TRAMMELL:  That would be worse.

12     THE COURT:  She's got a -- her mother has a good

13 aim.

14     MR. TRAMMELL:  Are you talking from experience?

15     THE COURT:  What?

16     MR. TRAMMELL:  Are you talking from experience?

17     THE COURT:  No, she's never hit me yet.  But you

18 don't want to put -- well, never mind.  We're not going

19 there.  Yes, so what is your proposal, Mr. Trammell?  You

20 have all this backup.  Who are all these people here?

21     MR. TRAMMELL:  It's like the Pips.  But, defense

22 counsel, is two weeks okay with us?

23     THE COURT:  Well, how long is your vacation?

24     MR. TRAMMELL:  It's -- until the following

25 weekend.

**UNREDACTED TRANSCRIPT**

58

```
 1                    THE COURT:  What does that mean?
 2                    MR. TRAMMELL:  Well --
 3                    THE COURT:  Weekend after this weekend?
 4                    MR. TRAMMELL:  -- to the 18th.  18th.
 5                    THE COURT:  Were you hired to count,
 6    Mr. Trammell?
 7                    MR. TRAMMELL:  It's this next week.  I come back
 8    the 18th.
 9                    THE COURT:  So if we were to move the thing two
10    weeks from today, that would be sufficient for you to
11    exercise your --
12                    MR. TRAMMELL:  That might keep my marriage
13    together, yes, Your Honor.
14                    THE COURT:  I'm all for keeping your marriage
15    together.  I don't want to bankrupt you.
16                    MR. TRAMMELL:  Thank you.
17                    MR. BURNS:  That's fine, Your Honor.  Two weeks.
18                    THE COURT:  Well, today's the 19th (sic).  That's
19    what, the 16th -- the 23rd, Mr. Mendez?
20                    CASE MANAGER:  Twenty-third, Your Honor.
21                    THE COURT:  All right.  July 23rd the parties
22    will submit a proposed notice regime.  I'll proceed on that
23    basis.  And once I have that, I'll take a look at that.  If
24    we need to come back, we'll come back.  I'm hoping we won't
25    need to come back.
```

**UNREDACTED TRANSCRIPT**

```
 1                    MR. BURNS:  Very good.

 2                    THE COURT:  And that an order -- I have a draft

 3     order, which of course if I find it all appropriate, I'll

 4     rewrite.

 5                    MR. WATSON:  Would Your Honor like us to reedit

 6     that based upon the preferred --

 7                    THE COURT:  Sure.  Any work you want to do is

 8     appreciated.

 9                    MR. WATSON:  We would change that to the new

10     notice plan that we come up with, resubmit that order, as

11     well as a notice of what those changes are.

12                    THE COURT:  So you're going to do that by the --

13                    MR. WATSON:  Twenty-third, yes, sir.

14                    THE COURT:  -- 23rd.  Okay.  So the new proposed

15     order is going to contain your proposed notice provision?

16                    MR. WATSON:  Correct.

17                    THE COURT:  All right.

18                    MR. WATSON:  Trying to hurry along, Your Honor.

19     I've got two children in college.

20                    THE COURT:  Okay.  What else have we left out,

21     Mr. Craddock, while you're over there being attentive?

22                    MR. CRADDOCK:  That's all I can contribute.

23                    THE COURT:  I did my best to slip it past you,

24     but I failed.

25                    All right.  What have I left out, or what do you
```

**UNREDACTED TRANSCRIPT**

1   want to contribute further here, Mr. Watson?

2            MR. WATSON:  I think that's it.  We -- you know,

3   we think we've got a nice, clean period out there for folks

4   to fill out the claim form and get paid, and we're ready to

5   move forward.

6            THE COURT:  Well, I have a -- after this, another

7   opportunity for a final approval hearing.  I just want to get

8   it as close as I can to something I might approve, so that I

9   don't waste a lot of time and everybody else's time, energy,

10  and money in coming to a final approval hearing where I can't

11  approve an action.

12           MR. WATSON:  Well, these cases, believe it or

13  not, have been certified.  Where we came up with some of the

14  language describing the class -- settlement class is from the

15  Seventh Circuit case called *Driver v. Marion County* where an

16  identical OMSE software had fouled up, where people were

17  being over-detained.  And the District Court granted the

18  certification in part and denied it in part.  Seventh Circuit

19  came back with, I believe, Judge Easterbrook, sort of

20  surprise, and said, no, this is all certifiable in every

21  level.  And so we used that language, which was the sheriff's

22  practice of employing a computer system inadequate for the

23  purpose intended with respect to the timely release of

24  prisoners.  So we have a similar language in our --

25           THE COURT:  Since you had all this assistance,

**UNREDACTED TRANSCRIPT**

1  does that mean we can reduce your fee?

2          MR. WATSON:  Wait, wait, wait.  Only if my wife

3  gets the --

4          MR. BURNS:  I'm going to make a motion to have

5  him removed as class counsel, Your Honor.

6          THE COURT:  Mr. Watson, he's never -- he's going

7  to be next invoking his wife and his vacation schedule to the

8  education of everybody in the world.

9          All right.  What about it, Mr. Horton?  What do

10 you have to contribute?  What questions?  Do you have

11 anything else you want to say to respond to any of my

12 questions?  Do you have anything you want me to know?

13 Anything you want to add to, subtract from, disagree with?

14         MR. HORTON:  Not at this time, Your Honor.  Thank

15 you.

16         THE COURT:  All right.  Mr. Trammell?

17         MR. TRAMMELL:  No, Your Honor.  But thank you for

18 accommodating my extra week.

19         THE COURT:  Be sure she understands that I get

20 all the credit.

21         MR. TRAMMELL:  Yeah, I will let her know that.

22         THE COURT:  Tell her you insisted on having the

23 time shortened, but I insisted on having it extended.

24 Actually, you don't have to do that because that's --

25         MR. TRAMMELL:  My lawyer says I can't comment.

**UNREDACTED TRANSCRIPT**

                                                      62

1                  THE COURT:  All right.  Mr. Bundren, are you out
2      there?
3                  MR. BUNDREN:  Yes, Your Honor.
4                  THE COURT:  What do you have that you want to
5      add?
6                  MR. BUNDREN:  I have nothing, Your Honor.  Thank
7      you.
8                  MR. WATSON:  He's got a son here, Your Honor.
9                  THE COURT:  A son?
10                 MR. WATSON:  Yes, sir.
11                 THE COURT:  Let me put on my glasses so that I
12     can see the son.  How are you?
13                 THE SON:  Good, Your Honor.
14                 THE COURT:  How old are you?
15                 THE SON:  Eleven years old.
16                 THE COURT:  How old is he?
17                 MR. BUNDREN:  Eleven.
18                 THE COURT:  Eleven.  I have two nephews who are
19     13.  They're now 13.  Great-nephews.  I wish they were
20     nephews.  My great-nephews are 13 each.  Are you in
21     Nashville?
22                 THE SON:  Yes, Your Honor.
23                 THE COURT:  What's that?
24                 THE SON:  Yes, Your Honor.
25                 THE COURT:  You are?  Well, it's good to have you

                          **UNREDACTED TRANSCRIPT**

 1   in court today.

 2              THE SON:  Thank you.

 3              THE COURT:  I'm glad you were able to come.  I'm

 4   not sure I've been able to do anything to further your

 5   education, but I appreciate having you here anyway.  You

 6   might want to talk to your dad on the way back.  There are

 7   some things I probably done that he would suggest never do if

 8   you're a judge.  Okay?  Thank you, Mr. Bundren.

 9              MR. BUNDREN:  Thank you, Your Honor.

10              THE COURT:  Who else is here?  Mr. Halijan?

11              MR. HALIJAN:  Thank you, Your Honor.  I've said

12   everything I wanted to say.

13              THE COURT:  I thought so, and silence gives

14   consent.

15              Mr. McLean, where are you?  There you are.

16              MR. MCLEAN:  I have nothing to add either.  I

17   appreciate Your Honor's going through everything with us, and

18   hopefully -- it sounds like we can get things worked out.

19   Thank you.

20              THE COURT:  We'll figure it all out eventually.

21              Now, Ms. Gwinn Pabon.  Did I get that right?

22              MS. PABON:  Yes, you did, sir.

23              THE COURT:  Well, there's a first time for

24   everything.  What do you want to suggest, Ms. Pabon?

25              MS. PABON:  I have nothing to add.  Thank you,

**UNREDACTED TRANSCRIPT**

64

 1   Your Honor.

 2             THE COURT:  And Mr. -- my second Mr. McLean?

 3             MR. McLEAN:  Your Honor, Tetrus has nothing

 4   further to add.  Appreciate your concern.

 5             THE COURT:  That's good to see all of you.  With

 6   luck, you won't have to see me again.  Without luck, we'll be

 7   back and I'll be -- I'll remain concerned about whatever is

 8   on the agenda.  And I'll wait a couple of weeks to see if we

 9   can get this notice thing in a better shape than I thought it

10   was in, although I understand everybody was pleased with it

11   except me.  Keep your fingers crossed.  If not, we'll -- I

12   think we get to adjourn for the day.  Is that right,

13   Mr. Mendez?

14             CASE MANAGER:  Yes, Your Honor.

15             THE COURT:  All right.  We're adjourned.  Nobody

16   has to do anything else.  You can now go home.

17             (Adjournment.)

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

65

1               **C E R T I F I C A T E**

2

3

4            I, TINA DuBOSE GIBSON, do hereby certify that the

5       foregoing 65 pages are, to the best of my knowledge, skill

6       and abilities, a true and accurate transcript from my

7       stenotype notes of the hearing on 9th day of July, 2021, in

8       the matter of:

9

10

11      Scott Turnage, et al.

12      vs.

13      Bill Oldham, et al.

14

15      Dated this 14th day of July, 2021.

16

17

18

19                          s/Tina DuBose Gibson

20                          _____
                            TINA DuBOSE GIBSON, RPR
21                          Official Court Reporter
                            United States District Court
22                          Western District of Tennessee

23

24

25

**UNREDACTED TRANSCRIPT**